IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OHIO NATIONAL LIFE ASSURANCE CORPORATION, | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | |
| DOUGLAS W. DAVIS, individually and as Trustee of the SHIRLEE DAVIS IRREVOCABLE LIFE INSURANCE TRUST, THEODORE R. FLOYD IRREVOCABLE LIFE INSURANCE TRUST, ROBERT S. HARRIS IRREVOCABLE LIFE INSURANCE TRUST, MARY ANN HARRIS IRREVOCABLE LIFE INSURANCE TRUST, and CHARLES M. BONAPARTE, SR. IRREVOCABLE TRUST; MAVASH MORADY; CHRISTINA BANK & TRUST, as Successor Trustee of the SHIRLEE DAVIS IRREVOCABLE LIFE INSURANCE TRUST; STEVEN EGBERT, as Successor Trustee of the CHARLES M. BONAPARTE, SR. IRREVOCABLE LIFE INSURANCE TRUST; SHIRLEE DAVIS; PAUL MORADY; THOMAS M. TICE; and THEODORE R. FLOYD, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 10 C 2386<br><br>Judge Virginia M. Kendall |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ohio National ("Ohio National") brought suit against individual defendants and the trusts associated with a stranger originated life insurance ("STOLI") scheme perpetuated by Douglas Davis ("Davis"), Mavash Morady ("Mavash"), and Paul Morady "(Paul") (collectively "Defendants"). As part of the scheme Defendants obtained life insurance policies using the identities of senior citizens, transferred the policies to themselves through trusts, then sold the policies to investors. Ohio National seeks damages and a declaration that the life insurance policies obtained

to jump-start the scheme were void at their inception. Steven Egbert ("Egbert"), an investor who had a beneficial interest in one of the nine insurance policies, moves to dismiss the Amended Complaint under Rule 12(b)(6) for failing to state a claim upon which relief can be granted.[1] For the following reasons, the Court denies Egbert's Motion to Dismiss.

## STATEMENT OF FACTS

At this initial stage, the Court takes the allegations asserted in the Complaint as true. *See Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995).

### I. General Nature of the Scheme

Defendants, as promoters for STOLI policies, convinced senior citizens to sign life insurance policies by promising that they would pay them money once the policies were issued. (Am. Compl. ¶ 11.) By applying for the insurance policies, however, the senior citizens signed documents creating irrevocable trusts naming Defendants as the owners and beneficiaries of the life insurance policies. (*Id.* ¶ 13.) Once Defendants acquired a financial interest in these policies, they sold them to investors for a profit. (*Id.*)

Specifically, Davis and Paul attended meetings at churches in the Chicago area to solicit senior citizens to apply for life insurance policies from Ohio National, an Ohio corporation authorized to issue life insurance policies in Illinois. (*Id.* ¶¶ 1, 11, 14.) Davis and Paul enticed the senior citizens to apply for the policies by promising either "free insurance" or payment of money upon issuance of the policies.[2] (*Id.* ¶¶ 11, 14.) Davis and Paul targeted the senior citizens despite

---

[1] The only count applicable to Egbert is Count I for declaratory judgment.

[2] Davis was not a licensed insurance agent but he participated in selling and preparing the life insurance policies anyway. (*Id.* ¶ 15.)

2

knowing from the beginning that they did not need life insurance, were unable to pay the premiums, and would have no freedom to designate the owners and beneficiaries of the policies. (*Id.* ¶ 14.)

The application for the insurance policy would designate a certain trust as the beneficiary and owner of the policy, and appoint Davis as Trustee. (*Id.*) Mavash signed the insurance applications and misrepresented to Ohio National material facts upon which Ohio National relied in issuing the policies. (*Id.* ¶ 15, 16.) She falsely vouched that she knew the senior citizen applicants, that she examined the applicants' financial records, and that each applicant had a net worth of at least one million dollars. (*Id.* ¶ 16.) As a result of this deception, Mavash received commissions of $118,849.40 from Ohio National. (*Id.*) Once they transferred the policies from the trusts to themselves, Defendants would turn around and sell them to investors such as Egbert. (*Id.* ¶¶ 35, 36.)

Had Ohio National known what it knows now, it would not have issued the nine life insurance policies, with a collective value of $5,200,000. (*Id.* ¶¶ 12, 17.) Ohio National therefore seeks a declaration that the procured policies were void since the beginning, damages, and equitable relief from detrimental reliance. (*Id.* ¶ 18.)

## II.  Charles Bonaparte Policy

Only the policy issued to Charles Bonaparte ("Bonaparte Policy") is relevant to this motion to dismiss.[3] (*Id.* ¶ 19.) On about April 26, 2007, Bonaparte, then 74 years old, learned about an "insurance program" through a presentation at his church, the Prayer Tower Church of God and Christ, in Chicago, Illinois. (*Id.* ¶ 20.) After the presentation, Davis reached out to Bonaparte and asked him to sign applications for life insurance policies with Ohio National and AXA Equitable.

---

[3] Bonaparte is also the named insured on another policy that AXA Equitable Life Insurance Company ("AXA Policy") issued in 2007 in the amount of $550,000. (*Id.* ¶ 19.) Mavash was the insurance producer for both the Bonaparte Policy and the AXA Policy. (*Id.*)

3

(*Id.*) Davis promised Bonaparte payment of $40,000 upon issuance of the policies. (*Id.*) Davis told Bonaparte that he "did not have to pay any premiums, that the only benefit to Charles Bonaparte was the cash inducement, and that the life insurance policies would be sold to investors." (*Id.*)

### A. Life Insurance Application

Davis's promise of $40,000 persuaded Bonaparte. On April 26, 2007, Bonaparte signed an application for $400,000 in life insurance coverage from Ohio National ("Application"). (*Id.* ¶ 22.) The Application created a trust, the Charles M. Bonaparte Sr. Irrevocable Life Insurance Trust ("Bonaparte Trust"), as the owner and beneficiary of the Bonaparte Policy. (*Id.*) The Application also named Davis as Trustee of the Bonaparte Trust. (*Id.*) Although he ultimately signed the Agreement, Defendants chose the Bonaparte Trust as the beneficiary of the policy, not Bonaparte. (*Id.*) Bonaparte signed the Bonaparte Trust on April 27, 2007, and Davis signed the Bonaparte Trust as Trustee on May 1, 2007. (*Id.* ¶ 23.)

By creating the Bonaparte Trust, Defendants acquired a $400,000 and $550,000 insurable interest in Bonaparte's life via the Bonaparte and AXA Policies. (*Id.* ¶ 24.) Bonaparte signed the Application for the Bonaparte Policy only to receive the cash payment Davis promised. (*Id.* ¶ 25.) He did not know the function of the Bonaparte Trust, or that, under Article I, he "relinquish[ed] absolutely" any interest in the property of the trust (i.e., life insurance policy).[4] (*Id.* ¶ 25.) Davis received the full panoply of rights that Bonaparte effectively signed away, including "absolute discretion" to exercise "all rights, powers and authority" regarding the Bonaparte Policy. (*Id.* ¶ 27.)

---

[4] In Bonaparte's deposition, he testified: "Let me make this clear. I did not apply for the insurance per se. I – what I did was, as an incentive for me to receive compensation because they wanted to insure me because of my good health to receive benefits for themselves. I didn't apply for the insurance. A program was presented to us, and I enrolled in the program." (*Id.* ¶ 25.)

4

On about May 1, 2007, Davis submitted the Application to Mavash to certify the information within it and submit it to Ohio National. (*Id.* ¶ 28.) As she did with other applications, Mavash falsely represented that: (1) she knew Bonaparte well; (2) she personally saw Bonaparte; and (3) after reviewing his financial records, Bonaparte had a net worth over $1,200,000. (*Id.* ¶¶ 29, 30.) Mavash sent the Application along to Ohio National on May 1, the same day she received it from Davis. (*Id.* ¶ 31.) On June 26, 2007, relying on Mavash's statements, Ohio National issued the Bonaparte Policy in the amount of $400,000 with an annual premium of $16,040. (*Id.*)

### B. Transfer of Interests in Bonaparte Policy

On July 17, 2007, Davis faxed to Bonaparte a stack of documents for him to sign and return, by overnight mail, to Paul's company, Camden Investments. (*Id.* ¶ 33.) One such document was titled "Irrevocable Transfer of Beneficial Interest in Trust," which named the Bonaparte Living Trust as Assignor and Camden Investment as Assignee. (*Id.*) That is, this document assigned to Paul (through Camden Investment) the beneficial interest in the Bonaparte Policy in exchange for payment of $8,000. (*Id.*) Bonaparte signed the "Irrevocable Transfer of Beneficial Interest in Trust" document to get the cash payment that Davis promised, despite not knowing its purpose. (*Id.* ¶ 34.)

An essential element of the scheme was for Defendants to attract and coordinate with investors, to whom they eventually sold their interests in the policies. (*Id.* ¶ 35.) Defendants sent Bonaparte another set of documents on about December 12, 2007; one was titled "Irrevocable Beneficial Interest Assignment," which named the Bonaparte Living Trust as the Assignor and Egbert, an investor, as Assignee. (*Id.* ¶ 36.) This document assigned the beneficial interest in the Bonaparte and AXA Policies to Egbert. (*Id.*) Then, on December 13, 2007, Davis appointed Egbert as Successor Trustee of the Bonaparte Trust. (*Id.* ¶ 37.) Bonaparte signed the Irrevocable Beneficial

5

Interest Assignment document on December 20, 2007. (*Id.* ¶ 38.) On about December 8, 2008, Egbert asked Ohio National to change its records to show that he was the Successor Trustee and new owner and beneficiary of the Bonaparte Policy. (*Id.* ¶ 42.)

After receiving the signed document from Bonaparte, Davis or one of his agents altered the first page of the Irrevocable Beneficial Interest Assignment. (*Id.* ¶ 39.) When Bonaparte signed the agreement, the first page indicated that the transfer was for "valid consideration," but afterwards it was changed to $69,521.00. (*Id.*) Davis adjusted the document to hide from Bonaparte that Egbert paid that much to acquire a beneficial interest in the Bonaparte and AXA Policies. (*Id.*)

In early 2008, Davis or Paul transferred between $4,000 and $6,000 into Bonaparte's personal bank account to compensate him for participating in the "insurance program" regarding the $550,000 AXA Policy. (*Id.* ¶ 40.) Since August 7, 2008, Egbert or his company, Steven Egbert, Inc., has paid premiums for the Bonaparte Policy. (*Id.* ¶ 41.) In fact, all along either Davis or Egbert, not Bonaparte, paid the premiums on the Bonaparte Policy. (*Id.* ¶ 43.)

## STANDARD OF REVIEW

To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In analyzing whether a complaint has met this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.

To withstand a Rule 12(b)(6) challenge, the complaint must overcome two obstacles. First, it must provide the defendant "fair notice" as to the character of the claim and the facts supporting it. *Twombly*, 550 U.S. at 555. The plaintiff must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Second, when there are well-pleaded factual allegations, the Court assumes their veracity, construes them in the light most favorable to the plaintiff, and then determines if they plausibly give rise to an entitlement to relief. *Id.*; *see Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011). At this early stage, the Court only tests the adequacy of the complaint, and does not evaluate the merits of the case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1521 (7th Cir. 1990).

## DISCUSSION

Egbert moves to dismiss the Amended Complaint for two separate reasons. First, Ohio National claims that the Bonaparte Policy was void from the very beginning because Defendants procured it as a "wagering contract" in which they had no insurable interest. Egbert contends that the allegations in the Amended Complaint fall short of supporting this claim. Second, Egbert maintains that the incontestability provision in the Bonaparte Policy prohibits rescission based on fraud if more than two years have passed since issuance of the policy. Because the filing of the Complaint occurred more than two years after Ohio National issued the Bonaparte Policy, Egbert argues that a claim for rescission is untimely.

**I.     Insurable Interest**

Both Ohio National and Egbert agree that Illinois law governs this dispute, as the essential transactions leading to execution of the Bonaparte Policy occurred here. Illinois law has consistently held that if, at the time an individual procures a life insurance policy, that individual has no

7

"insurable interest in the life of the insured," the policy is void.[5] *Bajwa v. Metro. Life Ins. Co.*, 776 N.E.2d 609, 616-17 (Ill. App. 2002); *Hawley v. Aetna Life Ins. Co.*, 125 N.E. 707, 708 (Ill. 1920) ("The Courts have uniformly held that one having no insurable interest in the life of another cannot procure a policy of insurance on such life, and the policy so procured is void at its inception."). These wagering contracts are contrary to public policy because they give the insured a "sinister counter interest in having the life [of the insured] come to an end." *Bajwa*, 776 N.E.2d at 617 (quoting *Grigsby v. Russell*, 222 U.S. 149, 154 (1911)). On the other hand, an individual has an insurable interest in his or her own life and can take out a life insurance policy designating anyone as a beneficiary, even if the beneficiary does not have an insurable interest. *Id.* at 617. Both of these competing considerations bear on whether Ohio National has sufficiently alleged that there was a lack of insurable interest at the time that Defendants, through Bonaparte, procured the Bonaparte Policy.

First, Egbert asserts that Bonaparte himself signed the Application for the Bonaparte Policy, and as such was free to pass it along to Egbert or anyone else as he saw fit. The allegations in the Amended Complaint, however, offer a different characterization: that Defendants procured the Bonaparte Policy by using Bonaparte as a "straw man." Even though Bonaparte did not necessarily need a life insurance policy, Defendants tempted him with payments of cash to fill out the Application. (Am. Compl. ¶ 11.) Bonaparte provided his signature, but the nature of the scheme was that he would provide little more—Defendants created all of the documents, designated the beneficiaries and owners, and asserted control over Bonaparte. (*Id.* ¶¶ 22, 33-42.) As pled, Defendants' scheme relied upon senior citizens to simply follow their orders to relay the interest in

---

[5] These types of contracts are known more generally as "wagering contracts."

the life insurance policies through a chain of trusts until it reached the investors. *See, e.g., Principal Life Ins. Co. v. Rucker*, 735 F. Supp. 2d 130, 135, 140 (D. Del. 2010) (no insurable interest at inception because insured signed the application for the policy but he only took out the policy so two businessmen could eventually sell it to investors); *Sun Life Assurance Co. of Canada v. Berck*, No. 09-498, 2011 WL 922289, at *1, 7 (D. Del. March 16, 2011) (senior citizen signed application for life insurance policy with the "help" of defendants and plaintiff sufficiently alleged that the policy was void *ab initio* for lack of any insurable interest). Finally, Bonaparte testified that, as he understood it, he "didn't apply for the insurance"; instead, he "enrolled" in a program where Defendants offered compensation to insure him to "receive benefits for themselves." (*Id.* ¶ 25.) Ohio National therefore presents sufficient allegations showing that Bonaparte did not take out the Bonaparte Policy on his own accord, nor did he exercise unfettered control over it.

Second, Egbert maintains that Ohio National has failed to sufficiently allege that Defendants had an agreement with a third party investor at the time Ohio National issued the Bonaparte Policy. Without such facts, Egbert argues, Ohio National cannot state a claim for lack of an insurable interest.

Neither the Seventh Circuit nor the Supreme Court of Illinois have clarified the pleading requirements for a claim that a life insurance policy was void for lack of insurable interest at the time the policy was issued. Egbert argues that there must be a "bilateral" agreement between the defendant and the third party investor to carry out the illegal STOLI scheme, and it had to be in place before Ohio National issued the Bonaparte Policy.[6] *See, e.g., Sun Life Assurance Co. of Canada v.*

---

[6] Egbert heavily relies on *Kramer v. Phoenix Life Ins. Co.*, 940 N.E.2d 535 (N.Y. 2010). First, of course, this is not binding precedent on this Court. Second, this case is distinguishable from *Kramer* because there are sufficient factual allegations to find that Bonaparte was induced and persuaded to apply for life insurance; that is, he did not apply

9

*Paulson*, No. 07-3877, 2008 WL 451054, at *2 (D. Minn. Feb. 15, 2008) (granting motion to dismiss on complaint that failed to identify a potential third party investor with whom defendant had arranged to sell the policy). Given the pleading stage, however, the majority of jurisdictions have taken a more lenient approach, finding that allegations describing in detail the STOLI scheme or referring generally to the involvement of a third party investor when the policy was issued are sufficient. *See, e.g., PHL Variable Ins. Co. v. Robert Gelb Irrevocable Trust*, No. 10 C 957, 2010 WL 4363377, at *3 (N.D. Ill. Oct. 27, 2010) (Kocoras, J.) (denying motion to dismiss because claim for rescission relied on the fact that the Trust lacked an insurable interest at the time it purchased the policy; complaint need not allege there was an agreement between the insured and third party investor at the date of issuance); *Lincoln Nat'l Life Ins. Co. v. Calhoun*, 596 F. Supp. 2d 882, 890 (D. N.J. 2009) (denied motion to dismiss on issue of whether there was mutual intent between the defendant and third party to assign the policy because "intent [is] critical to this determination, [so] dismissal at this juncture would be premature"); *Sun Life Assurance Co. of Canada v. Berck*, No. 09-498, 2011 WL 922289, at *7 (D. Del. March 16, 2011) (general allegations that defendants arranged a third party investor before procuring the policy was sufficient to go forward into discovery).

In a motion to dismiss the Court determines the sufficiency of the allegations in the Amended Complaint; it does not evaluate the merits of the case. Because the Court is primarily concerned with whether the Amended Complaint meets the notice and plausibility requirements of *Twombly* and *Iqbal*, it declines to adopt the more rigorous pleading threshold in *Paulson*. Ohio National's

---

for the policy on his "own initiative." Finally, looking only at the Amended Complaint, the allegations are sufficient to continue forward to discovery.

Amended Complaint extensively describes the numerous moving pieces that Defendants coordinated to implement the scheme, starting with the solicitation of elderly citizens followed by the transfer of interest in the policy and finishing with the sale to investors. In addition, Ohio National alleges that Defendants manipulated senior citizens to sign documents transferring interest in the policy, misrepresented information on the Application, named the trusts after Bonaparte to avoid detection, and from the beginning intended to sell the policies to investors. (Am. Compl. ¶ 24.) This is ample factual detail that Defendants had a scheme in place before the Bonaparte Policy was issued to get around the prohibition against wagering contracts. *See, e.g., Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust*, No. 09-506, 2010 WL 2898315, at *7-8 (D. Del. July 20, 2010) (denying motion to dismiss based on allegations similar to this case). Finally, the Amended Complaint highlights that Defendants' final transaction with investors was the source of their financial gain. (*Id.* ¶ 35.) The lack of specific details about an agreement between Defendants and Egbert before Ohio National issued the Bonaparte Policy does not doom the claim. Discovery is the proper vehicle to sort out this legal issue. *See, e.g., Lincoln Nat'l Life Ins. Co.*, 596 F. Supp. 2d at 890; *Lincoln Nat'l Life Ins. Co. v. Schwarz*, No. 09-3361, 2010 WL 3283550, at *8 (D. N.J. Aug. 18, 2010) ("discovery [is] essential to determining if the defendant had arranged to sell the policy to an individual or individuals with no insurable interest in the defendant's life at the time the policy application was submitted").

Ohio National therefore pleads a plausible claim based on lack of insurable interest.

## II.     Incontestability Provision

Most states, including Illinois, require that life insurance contracts have an incontestability provision, which bars the insurer from contesting the validity of the insurance policy if a certain

amount of time has passed since issuance of the insurance policy. *See, e.g., Amica Life Ins. Co. v. Barbor*, 488 F. Supp. 2d 750, 758 (N.D. Ill. 2007) (Moran, J.). Under Illinois law, insurers must bring an action to rescind a life insurance policy within two years of issuing it. *See* 215 ILCS 5/224(1)(c) (life insurance contracts must have a provision that "the policy . . . shall constitute the entire contract between the parties and that after it has been in force during the lifetime of the insured a specified time, not later than 2 years from its date, it shall be incontestable except for nonpayment of premiums . . ."). The incontestability provision serves to motivate insurers to timely investigate possible misrepresentations made in the life insurance application. *See Equitable Life Assurance Soc'y of U.S. v. Bell*, 27 F.3d 1274, 1279 (7th Cir. 1994).

Ohio National issued the Bonaparte Policy on June 26, 2007, and filed this action seeking rescission more than two years later, on April 16, 2010. Egbert claims that the incontestability provision's two-year limit bars Ohio National's claim. This argument, of course, assumes that the incontestability provision applies to an insurer's claim that there was a lack of an insurable interest in the life insurance policy.

Given Illinois's unwavering prohibition of wagering contracts, it is no surprise that an incontestability provision cannot stand in the way of the insured seeking to rescind a policy for lacking an insurable interest. That is, the two-year limit that the incontestability provision normally imposes on insurers does not apply to wagering contracts. *Charbonnier v. Chicago Nat'l Life Ins. Co.*, 266 Ill. App. 412, 1932 WL 2831, at *5 (Ill. App. 1932) (because insurance policies taken out by individuals with a non-insurable interest are "void at inception," they are "not rendered valid by a clause declaring it incontestable after the lapse of a specific period of time"); *Obartuch v. Security Mut. Life Ins. Co.*, 114 F.2d 873, 878 (7th Cir. 1940) (incontestable clause assumes a valid

contract, not one deficient from the beginning, so it "cannot be used as a vehicle to sanctify that which never existed"); *see, e.g., Sun Life Assurance Co. of Canada v. Paulson*, No. 07-3877, 2008 WL 451054, at *2 n.5 (D. Minn. Feb. 15, 2008) (if there are sufficient factual allegations that life insurance policy was void *ab initio*, then incontestability provision does not apply); *Am. Gen. Life Ins. Co. v. Tomlinson Ins. Trust*, No. 08-cv-1747, 2010 WL 3893673, at *6 (S.D. Ind. Sept. 30, 2010) (predicting that the Indiana Supreme Court would "likely join the majority of jurisdictions in holding that an insurer may raise the issue of a policy owner's lack of insurable interest regardless of the running of the period of contestability set forth in the policy").

Egbert's attempt to factually distinguish *Charbonnier* and *Obartuch* relies on an overly narrow reading of both cases. *Charbonnier* is not only limited to life insurance policies taken out by forging the insured's signature, and *Obartuch* is not confined to instances where the insured does not know about the issuance of the insurance policies. Collectively, they stand for the proposition that when the allegations in the complaint plausibly establish a lack of insurable interest, then the incontestability provision does not prevent the insurer from challenging the policies. *Charbonnier*, 1932 WL 2831, at *5; *Obartuch*, 114 F.2d at 878. Moreover, the fact that Bonaparte actually signed the Bonaparte Policy, does not, by itself, close the door on Ohio National. The Amended Complaint alleges that Defendants "induced" Bonaparte, among others, to apply for the policies by promising cash payment. As pled, the nature of this scheme—"sign the application and transfer documents now and we'll pay you $40,000 later"—manipulated senior citizens. Ohio National provides sufficient allegations to find that Bonaparte did not have uninhibited control over the policy. As such, the Court rejects dismissal of the Amended Complaint based on the incontestability provision.

Finally, Egbert argues that he is a good faith purchaser of the Bonaparte Policy and the equities in his favor warrant dismissal. The Court finds this ground to be insufficient, at this early stage, to overcome the fact that Ohio National has stated a claim that the Bonaparte Policy was void *ab initio*.

## **CONCLUSION AND ORDER**

For these reasons, the Court denies Egbert's Motion to Dismiss the Amended Complaint.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: July 6, 2011