# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

OHIO NATIONAL LIFE ASSURANCE
CORPORATION ,

      Plaintiff,

v.

DOUGLAS W. DAVIS, INDIVIDUALLY AND AS
TRUSTEE OF THE SHIRLEE DAVIS
IRREVOCABLE LIFE INSURANCE TRUST,
THEODORE R. FLOYD IRREVOCABLE LIFE
INSURANCE TRUST, ROBERT S. HARRIS
IRREVOCABLE LIFE INSURANCE TRUST,
MARY ANN HARRIS IRREVOCABLE LIFE
INSURANCE TRUST, AND CHARLES M.
BONAPARTE, SR. IRREVOCABLE LIFE
INSURANCE TRUST; CHRISTIANA BANK &
TRUST COMPANY AS SUCCESSOR TRUSTEE
OF THE SHIRLEE DAVIS IRREVOCABLE LIFE
INSURANCE TRUST; STEVEN EGBERT AS
SUCCESSOR TRUSTEE OF THE CHARLES M.
BONAPARTE, SR. IRREVOCABLE LIFE
INSURANCE TRUST; MAVASH MORADY;
PAUL MORADY; SHIRLEE DAVIS; THOMAS
M. TICE; AND THEODORE R. FLOYD,

      Defendants.

No. 10 C 2386

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Ohio National Life Assurance Corporation alleges that Douglas Davis, Paul
Morady and Mavash Morady conspired to procure life insurance policies from Ohio
National for people in whose lives Davis and the Moradys do not have an insurable
interest, i.e., Davis and the Moradys have no interest in the insureds continuing to
live. R. 76. Ohio National moves for summary judgment on its claims that Davis

and the Moradys are liable for civil conspiracy under Illinois law, and that Mavash Morady is liable for fraud under Illinois law and breach of her agency contract with Ohio National, which is governed by Ohio law. R. 241. Ohio National also moves for summary judgment on its claim for a declaration that the policies were void *ab initio*—i.e., they never came into existence because Davis and the Moradys procured the polices without an insurable interest in the lives of the insureds—such that Ohio National may keep the premiums paid on the policies. R. 241. Paul Morady has filed a cross-motion for summary judgment arguing that the policies are valid and that he is not liable for civil conspiracy. R. 263. Steven Egbert, who purchased one of the policies from Paul Morady and who Ohio National named as a defendant in order to retain the premiums Egbert has paid on the policy he bought, has also filed a cross-motion for summary judgment arguing that the policy he owns is valid, or, in the alternative, seeking return of the premiums he has paid. R. 248; R. 249. For the following reasons, Ohio National's motion, R. 241, is granted except that Ohio National must return the premiums Egbert paid; Egbert's motion, R. 248; R. 249, is granted to that extent, and otherwise denied; and Paul Morady's motion, R. 263, is denied.

## Background

As an initial matter, the Court notes that Paul Morady failed to file a statement of material facts pursuant to Local Rule 56.1, and Davis and Mavash Morady failed to file any papers in opposition to Ohio National's motion. Ohio National asks the Court to deem Davis and the Moradys to have admitted Ohio

National's statement of facts, R. 267 at 2-3, because Local Rule 56.1 provides, "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." The Court agrees that Davis and the Moradys have admitted Ohio National's factual allegations by failing to properly contest them. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Ohio National's summary judgment motion on the claims against these three defendants is granted on this basis alone. The Court is cognizant of the fact that Paul Morady filed his opposition papers and cross-motion pro se. But, as the Court discusses below, even accepting the facts as Paul Morady states them in his brief, the Court finds that there is no genuine dispute as to any material fact regarding Paul Morady's liability.

## I. The "Program"

Davis is an attorney and estate planner who gave estate planning seminars at churches in Chicago to "middle-class and upper-middle-class African-American seniors." R. 242-4 at 16:3-4. Davis testified that beginning in 2004 or 2005, he and Paul Morady—who Davis knew because their children went to school together, R. 242-4 at 14:16–15:1—"worked together" on "a program" in which Davis "worked as a trustee for potential investors" and "Morady agreed that he would assist . . . to the extent that some of the potential insure[d]s needed any assistance in obtaining financing for some of the insurance policies." R. 242-4 at 14:8-14. Paul Morady also testified that he could help the potential insureds "sell their interests if they wish to." R. 242-2 at 17:15-16.

Davis testified that he explained to his seminar attendees that a life insurance policy is an asset that can be sold, and the primary reason people chose to participate in the program he and Paul Morady devised was to sell their life insurance interests. R. 242-4 at 62:18–63:11, 67:16-18. Davis testified that he explained to potential participants in the "program" that he would help them (1) set up a trust to hold the life insurance policy, (2) apply for the insurance policy, (3) sell the beneficial interest in the policy, (4) find a buyer to purchase the beneficial interest, and (5) arrange for completion of the sale. R. 242-4 at 63:24–64:14. Davis testified that only people who required financing to afford the insurance were part of the program, R. 242-4 at 17:21-23, 64:21–65:18, and that a balloon payment on the financing notes would come due after two years, at which point the insured would "probably have to sell" the insured's interest in the policy. R. 242-4 at 65:15-18.

In early 2006, Davis and Paul Morady traveled to Chicago together. R. 242-2 at 14:1-5, 15:15-19. Paul Morady testified that the purpose of that trip was to give him an opportunity to research the possibility of financing insurance premiums in Illinois and for Davis to introduce him to "potentially mutual clients," as Davis is originally from Chicago and has friends and family there. R. 242-2 at 14:4-5, 14:16-18, 16:1-5.

On July 18, 2006, Paul Morady's wife, Mavash Morady, obtained a license to sell life insurance in Illinois. R. 242-5 at 11. She testified that she planned to get

business in Illinois from people for whom Davis acted as a trustee. R. 242-1 at 31:2-10, 31:20–32:3. She became an Ohio National agent on October 16, 2006. R. 242-9.

On August 9, 2006, Paul Morady registered an entity called Security Pacific Premium Financing with the Illinois Secretary of State, with himself as the sole owner, chairman, and chief executive officer. R. 242-6 at 2; R. 242-2 at 26:13-23, 52:3-8.

At issue in this case are life insurance policies Ohio National issued for the following five people: (1) Charles M. Bonaparte, Sr., R. 242-29; (2) Theodore R. Floyd, R. 243-14; (3) Shirlee Davis, R. 245-8; (4) Mary Ann Harris, R. 243-29; and (5) Robert S. Harris, R. 244-3. Davis signed and prepared irrevocable life insurance trusts[1] for each of these policies and had all five individuals sign documents permitting Mavash Morady to apply for the policies with Ohio National on their behalf. *See* R. 242-4 at 75:11-13, 80:15–81:8, 84:2-8, 89:12–91:9; R. 246 ¶¶ 31-33, 62-63, 74-77, 89-90. Additionally, all five individuals financed the premiums on their policies through Paul Morady's Security Pacific Premium Financing company. *See* R. 242-18; R. 243-15, R. 245-3; R. 242-2 at 221:23–222:12; R. 245-5; R. 245-10. For all five individuals, however, Paul Morady never transferred funds directly to any of the five insureds; instead he transferred the funds to Davis as trustee or Mavash Morady's company American Pacific General Agency, who then paid Ohio National's

---

[1] "An irrevocable life insurance trust is a non-amendable trust that is both the owner and beneficiary of one or more life insurance policies. Upon the insured's death, the trustee invests the insurance proceeds and administers the trust for one or more beneficiaries." John J. Gallo, *The Use of Life Insurance in Estate Planning: A Guide to Planning and Drafting*, 33 Real Prop. Prob. & Tr. J. 685, 729 (1999).

premiums. *See* R. 242-18; R. 243-15; R. 245-10; R. 245-3; R. 245-5. All five individuals eventually sold the beneficial interests in their trusts to Camden Investment Holdings, Inc., *see* R. 242-24; R. 243-21; R. 245-12; R. 245-2; R. 245-7, an entity wholly owned by Paul Morady. R. 242-2 at 54:7-9; R. 242-25. Other than Shirlee Davis, who is Douglas Davis's mother, none of these five individuals had any relationship with Davis beyond the transactions at issue in this case, and none of the five individuals ever heard of, let alone met, the Moradys. *See* R. 243-11 at 68:3-6; R. 243-27 at 44:13-15; R. 243-28 at 72:11-13, 70:13-16; R. 242-8 at 31:5-15; R. 242-14 at 52:1-5, 72:2-10.

These five individuals have also testified that either they did not believe that they were actually purchasing a life insurance policy or that they were never provided with a policy or payment. Bonaparte testified that he did not believe that he would actually receive a life insurance policy, but instead knew he was being paid simply to apply for the policy. Specifically, Bonaparte testified, "I knew from the very beginning that I was not going to be . . . the beneficiary of the program. All I was to receive for them using my name . . . is about $6,000 to $4,000." R. 242-14 at 18:12-15. Bonaparte also testified, "What I did was, as an incentive for me to receive compensation because they wanted to insure me because of my good health to receive benefit for themselves. I didn't apply for the insurance. A program was presented to us and I enrolled in the program. . . . I enrolled in the program because they said they give you compensation for signing up." R. 242-14 at 133:14-24. Additionally, Bonaparte testified that he did not know anything about a trust in his

name. R. 242-14 at 79:15–80:8, 88:14–89:10. Floyd testified that he never authorized Davis or anyone else to obtain an insurance policy on his life, and stated, "If I did, I didn't know what I was doing." R. 243-11 at 85:3-11. Robert and Mary Harris testified that they applied for "free" life insurance but that they never received a policy or payment or any communication about their application. R. 243-27 at 35:6-7, 33:9-16.[2]

Additionally, all five of the insureds sold their interests in their life insurance trusts before or very shortly after the life insurance policies for which they had applied purportedly took effect. Bonaparte signed an Ohio National application on April 26, 2007, and created his life insurance trust on April 27. R. 242-16. On June 2, 2007, Bonaparte transferred his interest in his life insurance trust to Camden. R. R. 242-24 at 12. On June 20, Ohio National informed Mavash Morady that Ohio National required a new application because the trust had been formed after the original application. R. 242-28. That same day, Bonaparte signed a new application with Ohio National. Davis and Mavash Morady received the policy on July 5. R. 242-28 at 33. And on July 17, 2007, Bonaparte signed another document purporting to transfer his interest in his life insurance trust for $6,000. R. 243-2.

Then on December 20, 2007, Bonaparte signed yet another document purporting to assign his interest in his life insurance trust to Steven Egbert for "valid consideration." R. 243-3 at 48; R. 242-14 at 93:6-20. The copy of this

_____

[2] Shirlee Davis testified that she believed she was purchasing a life insurance policy with her husband as beneficiary, but that she was unaware that her son Douglas Davis had become the beneficiary prior to the policy being sold.

document that Steven Egbert produced states that the assignment was for "consideration of $69,512." R. 243-5 at 50-53. The assignment Bonaparte signed was then appended to a "payment instructions" document that instructed Egbert to pay the $69,512 to Camden, Paul Morady's company. R. 246 ¶ 57; R. 243-6 at 4-5; R. 243-4 at 48-51.

On April 18, 2007, Floyd signed an Ohio National application and created his life insurance trust. R. 243-13 at 34. On May 18, 2007, Floyd transferred his interest in his life insurance trust to Camden. R. 243-21 at 12. Davis and Mavash Morady received the policy on June 26, 2007. R. 243-13 at 2.

On October 18, 2007, Robert and Mary Ann Harris signed separate Ohio National applications and created separate life insurance trusts for themselves respectively. R. 243-29 at 36; R. 244-2; R. 244-3 at 34; R. 244-4. On January 25, 2008, Robert Harris transferred his interest in Mary Ann's life insurance trust to Camden. R. 245-2 at 6. Davis and Mavash Morady received Mary Ann Harris's policy on March 28, 2008. R. 243-29 at 2.

On April 23, 2007, Shirlee Davis signed an Ohio National application and created her life insurance trust. R. 245-8 at 34. On June 2, 2007, Davis and Mavash Morady received Shirlee Davis's policy. R. 245-8 at 37. On June 13, 2007, Shirlee Davis sold her interest in her life insurance trust to Camden. R. 245-12.

Procuring these individuals to apply for life insurance and financing the purchase of their policies was a lucrative "program" for Paul Morady. Taking the Bonaparte policy as an example, Paul Morady paid Bonaparte $6,000. R. 246 ¶ 49.

Paul Morady also paid the first premium on this policy of $16,040. R. 243. Paul Morady then sold the Bonaparte policy to Egbert for $69,512, for a potential net profit of $47,472. Egbert bought the Bonaparte policy with the hope that the price he paid for it and the premiums he would pay to maintain it in the future would not exceed the death benefit. *See* R. 243-4 at 32:3–33:20.

## II.    Mavash Morady's Conduct

In addition to alleging that Davis and the Moradys conspired to procure invalid life insurance policies, Ohio National alleges that Mavash Morady's conduct constituted fraud and a breach of her agency contract with Ohio National. Mavash Morady has not filed papers in opposition to Ohio National's motion, and thus, the Court grants Ohio National's motion for summary judgment against Mavash Morady as unopposed.[3]

In any event, Mavash Morady admitted facts at her deposition sufficient to show that she breached her contract with Ohio National and committed fraud. Among other provisions, the agency contract with Ohio National that Mavash Morady signed, R. 242-1 at 88:23–89:11, 97:2-9, 117:18-21, required her to:

- comply with all laws and regulations, R. 242-11 at 5;

- obtain accurate and complete information on the application for insurance and report all other known information which may be pertinent to the risk, *id.* at 7;

- obtain the information from the proposed insured in person, *id.*;

---

[3] Mavash Morady was at one time represented by counsel but is now proceeding pro se. Paul Morady's opposition papers contain arguments in defense of Mavash Morady, but Paul Morady is not Mavash Morady's attorney, and thus, statements Paul Morady makes in his court filings cannot be attributed to Mavash Morady.

- complete [and] sign the application as the witnessing agent, *id.*; and

- not, under any circumstances, participate in a premium financing arrangement involving any type of premium financing provided by an unrelated third party, R. 242-12 at 2-3.

Contrary to these provisions in her contract, Mavash Morady testified that she (1) did not meet with any of the insureds in person or obtain information from them in person, R. 242-1 at 159:2-3, 159:11-13, 159:19-20, 160:3-4, 160:15-16; (2) failed to personally verify the accuracy of the information, R. 242-1 at 150:13-15, 170:1-5, 229:23–230:2; (3) signed but did not complete the applications, R. 242-1 at 110:22–111:2; (4) did not personally deliver any of the policies to any of the insureds, R. 242-1 at 112:10-12; and (5) knew that the policies were premium financed, R. 242-1 at 38:21-23, 41:22-24, 56:16-23. Thus, Mavash Morady has admitted that she breached her agency contract, and the Court grants Ohio National's motion for summary judgment on that claim.

Ohio National also seeks summary judgment on its claim that Mavash Morady's actions constituted fraud. Under Illinois law, the "elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996). Mavash Morady admits that she knew that the policies were premium financed and that she signed the applications without meeting the insureds or taking any action to verify the false information

contained in the applications she submitted to Ohio National. Thus, Mavash Morady has admitted that she made false statements in order to induce Ohio National to issue the policies. These admissions are sufficient for the Court to grant Ohio National's motion for summary judgment on its fraud claim against Mavash Morady.[4]

## III.   The Issues on These Motions

Four of the five policies are no longer at issue. Defendant Christiana Bank, trustee of the Shirlee Davis Irrevocable Life Insurance Trust, stipulated to entry of judgment voiding the Shirelee Davis policy *ab initio* and awarding premiums paid to Ohio National. R. 240. Defendant Thomas Tice, trustee of the Robert S. Harris and Mary Ann Harris Irrevocable Life Insurance Trusts, decided to cease paying premiums and allowed the policies to lapse. R. 247 at 2. Paul Morady was never able to sell the Floyd policy and that policy lapsed for failure to pay premiums. *Id.* The Bonaparte policy was assigned to Egbert for which Egbert paid Camden—Paul Morady's company—$69,512. Since the other four policies have either lapsed or are no longer contested, the focus of Ohio National's motion and the cross motions of Paul Morady and Egbert is the status of the Bonaparte policy, which Egbert

---

[4] Under Illinois law a breach of contractual promise, i.e., a false promise of future conduct, "without more" does not constitute fraud. *See Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 901 (7th Cir. 2006); *Firstar Bank, N.A. v. Faul*, 2001 WL 1636430, at *4 (N.D. Ill. Dec. 20, 2001). In other words, for a defendant to be liable under both theories of breach of contract and fraud the defendant must have breached the contract in a fraudulent manner. Here, Mavash Morady was not merely mistaken or negligent in failing to submit accurate information to Ohio National, but knew that she was either lying to Ohio National or intentionally failed to verify material information so that Ohio National would issue the policies. Thus, Mavash Morady is liable for both fraud and breach of contract.

purportedly bought from Paul Morady, and whether Paul Morady is liable for civil conspiracy.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

### I.    The Insurance Policy

Illinois law prohibits a person who has "no insurable interest in the life of another [from] procur[ing] a policy of insurance on such life." *Hawley v. Aetna Life Ins. Co.*, 125 N.E. 707, 708 (Ill. 1920); *see also PHL Variable Ins. Co. v. Robert Gelb Irrevocable Trust*, 2010 WL 4363377, at *3 (N.D. Ill. Oct. 27, 2010) ("Illinois law 'forbids one person who has no interest in the continuance of the life of another from

speculating on that life by procuring a policy of insurance.'" (quoting *Colgrove v. Howe*, 175 N.E. 569, 571 (Ill. 1931)). An "insurable interest is an interest in having the [insured's] life continue." *Hawley*, 125 N.E. at 708. A policy procured without an insurable interest "is void at its inception." *Id.* This rule is "grounded in public policy" intended to minimize circumstances in which a person has an "'interest in having the life come to an end.'" *Bajwa v. Met. Life Ins. Co.*, 776 N.E.2d 609, 617 (Ill. App. Ct. 1st Dist. 2002) (quoting *Grigsby v. Russell*, 222 U.S. 149, 154-55 (1911)).

Paul Morady argues that the Bonaparte policy is valid because Bonaparte "procured" the policy "at [his own] behest," and he had "the option of keeping the life insurance should [he have] desire[d] to do so." R. 263 at 11-12. This argument might have had some force if Bonaparte had ever owned the policy after Ohio National issued it. But the evidence shows that Bonaparte sold his interest in the policy before a final application was submitted on his behalf, let alone before Ohio National actually issued the policy. Bonaparte transferred his interest in his life insurance trust (which held the policy) to Paul Morady on June 2 but did not apply for the life insurance policy until June 20. Davis and Mavash Morady signed a receipt for delivery of the policy on July 5, and Paul Morady paid the first premium due on July 17. As Ohio National puts it, "If Charles Bonaparte had died the moment the Bonaparte Policy became effective, Paul Morady . . . would [have] own[ed] the $400,000 death benefit." R. 247 at 12. A life insurance policy that would never have paid out money to Bonaparte's estate or his beneficiaries cannot have

been procured to benefit Bonaparte or his beneficiaries. Rather, the timing of the transfer of Bonaparte's interest in his life insurance trust makes clear that Davis and the Moradys procured the Bonaparte policy with the intent to transfer it to Paul Morady. Thus, the Bonaparte policy is contrary to Illinois law and is void *ab initio*.[5]

Egbert cites *Kramer v. Phoenix Life Ins. Co.*, 940 N.E.2d 535 (N.Y. 2010), to argue that it is permissible for a person to take out a policy on his own life with the intent that he will then sell the beneficial interest. Besides the fact that *Kramer* applies New York law that is not at issue here—which in addition, has since been amended, *id.* at 549 n.5—*Kramer* is inapposite. In *Kramer*, the insured named his children as beneficiaries. *Id.* at 546. After the insured had applied for and received the policy, the insured's children—not the insured himself—sold their beneficial interests. *Id.* Here, by contrast, Bonaparte himself sold his life insurance policy before a final application for the policy had been submitted on his behalf.

Paul Morady and Egbert also both argue that even if the Bonaparte policy was procured in violation of Illinois law, Ohio National's claim is barred by the policy's two-year incontestability period. Under Illinois law, insurers must bring an action to rescind a life insurance policy within two years of issuing it. *See* 215 ILCS 5/224(1)(c). But in ruling on Egbert's motion to dismiss, R. 86, the Court (Kendall,

---

[5] Notably, this reasoning is equally applicable to the Floyd policy based on the following timeline of events: (1) on April 18, 2007, Floyd signed an Ohio National application and created his life insurance trust, R. 243-13 at 34; (2) on May 18, 2007, Floyd transferred his interest in his life insurance trust to Camden, R. 243-21 at 12; and (3) Davis and Mavash Morady received the Floyd policy on June 26, 2007, R. 243-13 at 2.

J.) has already held that "an incontestability provision cannot stand in the way of the insured seeking to rescind a policy for lacking an insurable interest." R. 120 at 12 (*Ohio Nat. Life Assur. Corp. v. Davis*, 2011 WL 2680500, at *7 (N.D. Ill. July 6, 2011) (citing cases)). Neither Paul Morady nor Egbert has made an argument as to why the Court's prior reasoning was incorrect, and the Court sees no reason to reconsider its earlier ruling on this issue.

Egbert also tries a waiver argument of a different type by arguing that Ohio National "has waived its right to contest the fact that the policy is void ab initio" for two reasons: (1) "a policy of insurance cannot be avoided by the insurer on the ground of facts which were known to the agent," and (2) Ohio National has "recognized the continued validity of the policy" by retaining the premiums Egbert has paid. R. 249-2 at 10-11. Both of these points, however, assume that Ohio National seeks to "avoid," or rescind, a validly existing policy. But this is not a correct characterization of Ohio National's claim or the facts. Instead, as the Court discussed above, Ohio National argues, and the Court has found, that the policy was procured by Davis and the Moradys without an insurable interest, and thus, is void *ab initio*, meaning that it "is treated as though it never existed." *Ill. State Bar Ass'n Mut. Ins. Co. v. Law Office of Tuzzolino*, ___ N.E.2d ___, 2013 WL 6157417, at *6 (Ill. App. Ct. 1st Dist. Nov. 22, 2013); *see also Jensen v. Quick Int'l*, 820 N.E.2d 462, 466-67 (Ill. 2004) ("[R]escission presumes the existence of an otherwise valid and enforceable contract."); *Penn Mut. Life Ins. Co. v. Greatbanc Trust Co.*, 887 F. Supp. 2d 822, 828 (N.D. Ill. 2012) (holding that rescission is not a proper remedy when an

insurance policy is found to be void *ab initio* because it was procured without an insurable interest).

Egbert's argument incorrectly assumes that Mavash Morady's fraudulent conduct is the basis for Ohio National's claim that the policy is void. Based on that incorrect assumption, Egbert contends that because Mavash Morady was Ohio National's agent and Mavash Morady knew about the fraud, that knowledge can be imputed to Ohio National. But fraud is a basis to void a contract that is voidable, which is a claim that would be barred by an incontestability provision. Presumably for this reason Ohio National does not allege fraud in order to avoid the policy. Rather, Ohio National argues, and the Court agrees for the reasons stated earlier, that the Bonaparte policy was against public policy from the start and never came into existence. Thus, Mavash Morady's knowledge of the fraud is irrelevant to the validity of Ohio National's claim.

Egbert's line of argument continues that if rescission is not an adequate basis to require Ohio National to return the premiums he has paid, the Court should force Ohio National to return the premiums as a matter of equity. Ohio National argues, to the contrary, that the Court should "leave the parties where they are with no refund of the premiums" because the policy was void *ab initio*. R. 247 at 15. In making this argument, Ohio National relies heavily on Illinois law reviewed in a recent case from this district (Tharp, J.) in which the court addressed this issue and "[d]eclin[ed] to make *any* order with respect to the premiums" because "'[e]nforcement of [an] illegal contract makes the court an indirect participant in the

wrongful conduct,'" and "'in the case of illegal contracts the courts would not, on one hand, undo what has been done, nor on the other, perfect what has been left unfinished.'" *Penn Mut. Life Ins. Co. v. Greatbanc Trust Co.*, 887 F. Supp. 2d 822, 830 (N.D. Ill. 2012) (quoting *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 619 N.E.2d 732, 738 (Ill. 1993), and *Sellers v. Phillips*, 37 Ill. App. 74, 76 (1st Dist. 1890)) (emphasis added). On this authority, Judge Tharp reasoned that the mere fact that the insurance company had collected premiums on a policy that was void *ab initio* was an insufficient basis to order the insurance company to return the premiums. *Penn Mut. Life*, 887 F. Supp. 2d at 830. The Court agrees with this reasoning and will not order Ohio National to return Egbert's premiums merely because the Bonaparte policy is void *ab initio*.

In *Penn Mutual*, however, Judge Tharp also did not declare that the premiums rightfully belonged to the insurance company. *Penn Mut. Life*, 887 F. Supp. 2d at 831. Rather, the court went on to say that the premium-payer's counter-claim for unjust enrichment remained to be decided despite the fact that the policy was void *ab initio*, and the court reserved judgment on that issue. *Id.* at 832.[6] Here, Egbert's answer included a general affirmative defense that Ohio National's "claims are barred by . . . equitable doctrines," R. 121 at 48, but it did not include an express unjust enrichment counter-claim. Nevertheless, in his brief, Egbert requested leave to file a counter-claim for unjust enrichment. R. 249-2 at 15 n.3. Moreover, Ohio

---

[6] The parties in Penn Mutual stipulated to dismissal before the court rendered an opinion on the unjust enrichment claim. *See Penn Mut. Life*, 09 C 6129, Dkt. No. 201 (N.D. Ill. Apr. 3, 2013).

National has raised the question of whether it is equitable for Ohio National to retain the premiums by asking to the Court for a declaration to that effect while disclaiming any right to rescission. But absent rescission, the only basis for the Court to declare that Ohio National is the legitimate owner of the premiums is for the Court to hold as a matter of public policy that it is equitable for an insurance company to retain premiums paid on a policy that is void *ab initio*. Thus, since both Ohio National and Egbert have raised and addressed the issue of whether it is equitable for Ohio National to retain the premiums Egbert paid, the Court will also address it.

The parties have not cited Illinois authority directly on point, nor has the Court found any. In general, to state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). Additionally, the Restatement (Third) of Restitution and Unjust Enrichment § 32 provides as follows:

> A person who renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy may obtain restitution from the recipient in accordance with the following rules:
>
> (1) Restitution will be allowed, whether or not necessary to prevent unjust enrichment, if restitution is required by the policy of the underlying prohibition.
>
> (2) Restitution will also be allowed, as necessary to prevent unjust enrichment, if the allowance of restitution will not defeat or frustrate the policy of the underlying

prohibition. There is no unjust enrichment if the claimant receives the counter performance specified by the parties' unenforceable agreement.

(3) Restitution will be denied, notwithstanding the enrichment of the defendant at the claimant's expense, if a claim under subsection (2) is foreclosed by the claimant's inequitable conduct.

Here, there is no dispute that Ohio National has "retained a benefit to [Egbert's] detriment." According to the Restatement, the pertinent questions then are whether restitution of the premiums to Egbert would "frustrate the policy of the underlying prohibition," and whether restitution "is foreclosed by the claimant's inequitable conduct."

Restitution here would not frustrate the policy against procurement of a life insurance policy without an insurable interest. Although Ohio National emphasizes the fact that Egbert has admitted that he frequently trades in the secondary life insurance market, such activity is not against Illinois law or policy. Illinois prohibits convincing a person to apply for a life insurance policy with the intent to immediately sell it. But a policy purchased for an "insurable interest"—i.e., to provide future monetary benefit for a person who otherwise has an interest in maintaining the insured's life—may subsequently be assigned to a person without such an interest. *See* 215 ILCS 5/245.1 Thus, requiring Ohio National to return Egbert's premiums would not reward conduct that Illinois law and policy is designed to prohibit.

Additionally, Ohio National does not allege, and the evidence in the record does not suggest, that Egbert was complicit in the "program" perpetrated by Davis

and the Moradys. Ohio National merely alleges that Egbert did not sufficiently investigate "whether there was an insurable interest at the time the Bonaparte Policy was issued." R. 259 ¶ 10; *see generally id.* ¶¶ 13-27. Without any allegation or evidence that Egbert is liable for procuring the Bonaparte policy, there is no basis for the Court to find that it would be just for Ohio National to retain the premiums Egbert paid. Accordingly, Ohio National must return the premiums it received from Egbert.

As for Paul Morady, as the Court will discuss below, he is liable for civil conspiracy in connection with procuring the policies at issue. Thus, Ohio National may retain any premiums paid by Paul Morady.

## II.     Civil Conspiracy

Under Illinois law, a "civil conspiracy occurs when two or more people combine to accomplish, through concerted action, either an unlawful act or a lawful act in an unlawful manner." *Multiut Corp. v. Draiman*, 834 N.E.2d 43, 51 (Ill. App. Ct. 1st Dist. 2005). A "defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives . . . is liable as a conspirator." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999).

The evidence shows, and Davis and the Moradys admit, that they worked together to procure life insurance policies from people in whose lives they possessed no insurable interest. The Court has already discussed that the policies were procured without an insurable interest. The undisputed evidence also shows that

Davis and the Moradys worked together to accomplish the following: (1) procure individuals at churches in Chicago to apply for insurance policies; (2) apply for insurance policies with Mavash Morady as agent; (3) finance the purchase of the policies through Paul Morady's company; and (4) arrange for the policies to be sold or assigned to another of Paul Morady's companies. These facts constitute a civil conspiracy to procure life insurance policies without an insurable interest.

Paul Morady argues that "the goal of the . . . program was to allow middle class African Americans to be able to use life insurance as an asset." R. 263 at 17. But regardless of any purported altruistic motivations, procuring or encouraging people to buy life insurance "to use it as an asset" is illegal in Illinois when the person doing the procuring plans to buy the policy.

Paul Morady also argues that he only financed the purchase of the policies and did not own them, and the insureds always had the option to retain the policy. The documentary evidence belies this contention. Paul Morady purchased each of the policies, and in most cases this transfer took place *prior* to Ohio National ever issuing the policy. Furthermore, all of the insureds required financing to purchase the policies, and none of them had the means to retain the policies beyond the balloon payment date that always came due within two years. Paul Morady, as the person responsible for the terms of the financing, made certain that the insureds would eventually be forced to sell the policies to him. Thus, the uncontested facts

show that Paul Morady engaged in a conspiracy to procure life insurance policies without an insurable interest in the insureds.[7]

## Conclusion

For the foregoing reasons, Ohio National's motion, R. 241, is granted, and Steven Egbert's motion, R. 248; R. 249, and Paul Morady's motion, R. 263, are denied to the extent that the Bonaparte policy is declared void *ab initio*. Ohio National's motion is granted, and Paul Morady's motion is denied, to the extent that Douglas Davis, Paul Morady and Mavash Morady are liable for civil conspiracy to procure the Bonaparte and Floyd policies, and Mavash Morady is liable for fraud and breach of contract. Ohio National's motion is denied, and Steven Egbert's motion is granted, to the extent that Ohio National must return any premiums Egbert paid on the Bonaparte policy. Ohio National's motion is granted, and Paul Morady's motion is denied, to the extent that Ohio National may retain any premiums Paul Morady paid Ohio National.

A status conference is scheduled for February 21, 2014, at 9 a.m., at which the parties should be prepared to discuss how to proceed with the following claims that Ohio National's motion did not address: Count II against Davis for fraud;

---

[7] Paul Morady also argues that stranger originated life insurance policies were not illegal in Illinois until 2009 when the legislature passed such a statute. R. 263 at 16. But as the Court has already discussed at length, such conduct has been prohibited by common law for many years. Conduct made illegal by common law is sufficient to form the basis of a civil conspiracy. *See, e.g., Edalatdju v. Guaranteed Rate, Inc.*, 748 F. Supp. 2d 860 (N.D. Ill. 2010) (denying motion to dismiss claim for civil conspiracy for common law fraud); *Ill. Non–Profit Risk Mgmt. Ass'n v. Human Serv. Center of S. Metro–East*, 884 N.E.2d 700, 711 (Ill. App. Ct. 4th Dist. 2008) ("[Defendants] failed to adequately allege their underlying claim of common-law fraud, and thus their conspiracy claim fails as a matter of law.").

Count III against Davis for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; Count V against Davis for unjust enrichment; and Count VI against Shirlee Davis and Theodore Floyd for civil conspiracy. Absent another reasonable suggestion, a prompt trial date will be set. The parties should also be prepared to discuss the procedure for calculation of damages on the claims decided by this Order.

ENTERED:

_Thomas M Durkin_
_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  February 7, 2014