UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| OHIO NATIONAL LIFE ASSURANCE CORPORATION , | |
| Plaintiff, | No. 10 C 2386 |
| v. | Judge Thomas M. Durkin |
| DOUGLAS W. DAVIS, INDIVIDUALLY AND AS TRUSTEE OF THE SHIRLEE DAVIS IRREVOCABLE LIFE INSURANCE TRUST, THEODORE R. FLOYD IRREVOCABLE LIFE INSURANCE TRUST, ROBERT S. HARRIS IRREVOCABLE LIFE INSURANCE TRUST, MARY ANN HARRIS IRREVOCABLE LIFE INSURANCE TRUST, AND CHARLES M. BONAPARTE, SR. IRREVOCABLE LIFE INSURANCE TRUST; CHRISTIANA BANK & TRUST COMPANY AS SUCCESSOR TRUSTEE OF THE SHIRLEE DAVIS IRREVOCABLE LIFE INSURANCE TRUST; STEVEN EGBERT AS SUCCESSOR TRUSTEE OF THE CHARLES M. BONAPARTE, SR. IRREVOCABLE LIFE INSURANCE TRUST; MAVASH MORADY; PAUL MORADY; SHIRLEE DAVIS; THOMAS M. TICE; AND THEODORE R. FLOYD, | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Ohio National Life Assurance Corporation brought this action alleging that Douglas Davis, Paul Morady, and Mavash Morady conspired to procure life insurance policies from Ohio National for people in whose lives Davis and the Moradys do not have an insurable interest, i.e., Davis and the Moradys do not have customarily insurable relationships with the insureds (e.g., spousal or familial). R.

76. The Court previously granted Ohio National's motion for summary judgment on its claims of civil conspiracy against Davis and the Moradys, and for fraud and breach of contract against Mavash Morady, and denied Paul Morady's cross motion for summary judgment on those claims. R. 275 (*Ohio Nat'l Life Assurance Corp. v. Davis*, 2014 WL 500539 (N.D. Ill. Feb. 7, 2014)). In granting Ohio National's motion, the Court also found that the insurance policies at issue were void *ab initio*—i.e., never came into existence because Davis and the Moradys procured the polices without an insurable interest in the lives of the insureds—such that Ohio National may keep the premiums paid on the policies, except for those premiums paid by Steven Egbert who purchased one of the policies from Paul Morady. *Id.*

At the Court's instruction, Ohio National has now filed a motion for judgment on damages. R. 277. Additionally, Paul Morady—who opposed Ohio National's summary judgment motion pro se—has joined with his wife, Mavash Morady, to retain counsel and file a motion to vacate the Court's summary judgment order. The Moradys argue that the Court should vacate its summary judgment order because Ohio National failed to comply with Local Rule 56.2, which required Ohio National to advise the Moradys of the requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1. R. 289. The Moradys have also opposed Ohio National's motion for judgment on damages. R. 295. Davis filed notices stating that he joins the Moradys' filings. R. 291; R. 299. Egbert requests that the Court enter judgment awarding him the premiums he paid to Ohio National. R. 288. For the following reasons, the Court

denies the Moradys' motion to vacate, and enters judgment in favor Ohio National in the amount of $725,666.56, and in favor of Egbert in the amount of $90,644.38.

## Background

### I. Procedural History

Ohio National filed this action more than four years ago on April 16, 2010. R. 2. Paul Morady entered an appearance pro se on February 4, 2011. R. 100. An attorney entered an appearance for Mavash Morady on June 18, 2010, R. 25, but was granted permission to withdraw on December 1, 2011. R. 149.

Even though neither of the Moradys was represented by counsel as of December 1, 2011, their current counsel, Richard Leng, appeared in Court on behalf of the Moradys at a hearing on June 12, 2012. *See* R. 293; R. 207. Leng, however, did not formally enter an appearance. *Id.* Instead, Leng sought permission to represent the Moradys for the limited purpose of defending them at their depositions. *See* R. 293 at 7:15-19. The Court denied this request. *Id.* The Court set a briefing schedule for dispositive motions at the hearing Leng attended, *see id.* at 7:20-22, and Ohio National filed its summary judgment motion four months later on October 12, 2012. R. 241.

Despite not having entered an appearance, during the four months between the June 12 hearing and Ohio National's filing of its summary judgment motion on October 12, Leng filed documents on the Moradys' behalf on three separate occasions. *See* R. 202-03; R. 215; R. 234-35. Leng did not again file any documents or

attempt to appear on the Moradys' behalf until appearing for the purpose of filing the Moradys' motion to vacate that is at issue now.

Paul Morady filed a request for an extension to respond to Ohio National's summary judgment motion, which Mavash Morady signed. R. 250. Paul Morady also filed documents in opposition to Ohio National's motion—styled as a cross-motion for summary judgment—including a memorandum of law, a declaration from Davis, and Paul Morady's own declaration. *See* R. 263. Paul Morady did not file a response to Ohio National's statement of material facts, but he did include a "Statement of Facts" in his memorandum of law. *Id.* at 4-7. Mavash Morady never responded to Ohio National's motion for summary judgment beyond joining Paul Morady's filings. R. 266. Other than the declaration from Davis that Paul Morady filed, Davis did not file any papers in opposition to Ohio National's motion.

The Court granted Ohio National's motion for summary judgment, "even accepting the facts as Paul Morady states them in his brief." R. 275 at 3 (*Ohio Nat'l*, 2014 WL 500539, at *1). The Court held that Paul Morady's account of the relevant events was not contrary to the evidence in the record showing that the original insureds transferred their interests in their life insurance trusts to Paul Morady's company prior to Ohio National issuing the policies, "mak[ing] [it] clear that Davis and the Moradys procured the [policies] with the intent to transfer [them] to Paul Morady," and then sell them on the secondary market. R. 275 at 14 (*Ohio Nat'l*, 2014 WL 500539, at *5). The Court also found that Davis and the Moradys made admissions at their depositions (and in the case of Paul Morady, in his court filings)

sufficient to grant summary judgment to Ohio National on its claims of conspiracy against the three defendants, and breach of contract and fraud against Mavash Morady. The Court rejected Paul Morady's defense that his motives were altruistic and legal, because "regardless of any purported altruistic motivations, procuring or encouraging people to buy life insurance 'to use it as an asset' is illegal in Illinois when the person doing the procuring plans to buy the policy." R. 275 at 21 (*Ohio Nat'l*, 2014 WL 500539, at *9).

In support of their motion to vacate, the Moradys filed a document titled "Defendants LR56.1(b)(3) Response to Plaintiff's LR56.1 Statement," R. 294-1, which responds to the statement of material facts that Ohio National filed in support of its motion for summary judgment. The Moradys describe this document as "defendants proposed Rule 56.1(b) response on liability," R. 294 at 1, and it is purportedly signed by Davis, although his actual signature does not appear on the document and the document was filed using Leng's electronic filing credentials. This document (R. 294-1) is intended to show that had the Moradys been sufficiently informed of their obligations on summary judgment they would have demonstrated genuine disputes of material fact. This document, however, misstates a number of Ohio National's statements of fact, and admits all but twelve of Ohio National's statements of fact. *See id.* ¶¶ 7, 27-29, 43, 47, 52, 55, 66, 99-101.

## II. Premiums and Damages

At the outset of this litigation, Ohio National deposited with the Clerk of the Court $437,731.38 in premiums received on the insurance policies at issue in this

case, to be held in escrow. R. 32. The Court held that Ohio National may keep any of the premiums paid by Paul Morady, Mavash Morady, or Davis, but ordered Ohio National to return to Egbert any premiums he paid. *See* R. 275 at 22 (*Ohio Nat'l Life*, 2014 WL 500539, at *9). Ohio National and Egbert have agreed that the amount Ohio National must return to Egbert is $90,644.38. R. 281.

Additionally, the following facts relevant to potential damages in this case are undisputed: (1) Ohio National paid Mavash Morady $120,127.41 in commissions related to the sale of the insurance policies at issue in this case, R. 294-1 ¶ 104; (2) Ohio National incurred and paid $529,746 in attorneys' fees pursuing this action, R. 295-1 ¶ 17; and (3) Ohio National paid the following additional amounts of money in pursuing this action: $26,565 for expert witness fees; $32,806.42 in deposition costs; $9,056.11 in costs for document subpoenas and production; $3,172.11 in costs for service of process; $2,646.85 in investigation costs; and, $1,402.66 in other litigation costs, including copying, service of filings, and preparation of court copies, R. 295-1 ¶¶ 20-21. These fees and costs are supported by records from the law firm representing Ohio National. *See* R. 280-14.

## Analysis

### I.  Motion to Vacate

The Moradys argue that the Court should vacate its grant of summary judgment to Ohio National because Ohio National failed to comply with Local Rule

56.2.[1] Local Rule 56.2 requires "any party moving for summary judgment against a party proceeding pro se [to] serve and file as a separate document, together with the papers in support of the motion," a notice explaining the procedures for complying with Federal Rule of Civil Procedure 56. Nevertheless, a failure to comply with Local Rule 56.2 does not require reversal of a court's grant of summary judgment "'unless there is reason to believe that the [non-movant] was prejudiced by the failure, that is that he could have established that there was a genuine issue of material fact, precluding the grant of summary judgment, if he had had a reasonable opportunity to submit affidavits.'" *Wicker v. Ill. Dep't of Public Aid*, 215 F.3d 1331, at *3 (7th Cir. 2000) (quoting *Seller v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994)); *see also Timms v. Frank*, 953 F.2d 281, 286 (7th Cir. 1992) ("The question of prejudice is relevant [because] if [the non-movant] could not have avoided summary judgment if she had received adequate notice, there would be no point in remanding."); *Santiago v. United Air Lines, Inc.*, 969 F. Supp. 2d 955, 960 (N.D. Ill. 2013) ("[A] movant's failure to give the Local Rule 56.2 notice is without legal significance 'if no prejudice resulted.'" (quoting *Kincaid v. Vail*, 969 F.2d 594, 599 (7th Cir. 1992))).

Ohio National's primary argument against the Moradys' motion to vacate is that "[n]o prejudice exists for lack of LR56.2 Notice when the *pro se* party's 'actions

---

[1] Davis is an attorney, so to the extent he intends to join the Moradys' motion to vacate, the Court rejects that request because attorneys, even those representing themselves, are not pro se plaintiffs for the purposes of Local Rule 56.2. *See Godlove v. Bamberger, Foreman, Oswald, & Hahn*, 903 F.2d 1145, 1148 (7th Cir. 1990) ("Ordinarily, we treat the efforts of *pro se* applicants gently, but a *pro se* lawyer is entitled to no special consideration.").

reveal that she knew what she had to do to oppose this motion.'" R. 309 at 5 (quoting *Timms*, 953 F.2d at 286). Ohio National argues that Paul Morady's filings in opposition to summary judgment evince an understanding of his obligations under Rule 56, and that he "exercised [his] right to submit evidence by filing Declarations." R. 309 at 5. The quote from *Timms* upon which Ohio National bases this line of argument, however, is not a holding of the court, but a recitation of a party's argument in that case. The contention that a pro se party who "knew what she had to do to oppose" summary judgment is not prejudiced by a lack of notice under Local Rule 56.2, is not an accurate statement of the law and is not a sufficient basis to deny the Moradys' motion to vacate. Furthermore, it is undisputed that the Moradys did not receive the notice required by Local Rule 56.2 and that they failed to properly respond to Ohio National's statement of material facts. On this basis, and giving the Moradys the benefit of the doubt as pro se plaintiffs (despite the evidence on the docket that they had regular contact with counsel leading up to the filing of Ohio National's summary judgment motion), the Court assumes that the Moradys were not adequately informed as to how to proceed on summary judgment. The relevant question then is not whether the Moradys' were prejudiced in that their knowledge of proper procedure under Rule 56 was lacking, but whether the Moradys were prejudiced in that they "could have established that there was a genuine issue of material fact" if they had properly complied with Rule 56 and Local Rule 56.1. *See Wicker*, 215 F.3d 1331, at *3 (quoting *Sellers*, 41 F.3d at 1102).[2]

---

[2] Ohio National also cites *Morris v. City of Chicago*, 545 Fed. App'x 530 (7th Cir.

### A.     Paul Morady's Conduct

The Moradys argue that they were prejudiced by Ohio National's failure to provide them with the notice required by Local Rule 56.2 "in that they did not have an opportunity to present material facts that would have precluded summary judgment on the conspiracy count against Paul Morady and Douglas Davis . . . and the fraud count against Mavish Morady." R. 294 at 1. Specifically, the Moradys cite a legal opinion that Paul Morady commissioned, which he believed demonstrated the legality of his plan with Davis to finance life insurance policies. The Moradys contend that Paul Morady's reliance on this legal opinion demonstrates that he had no intent to violate the law. *Id.* at 2.

The Moradys' argument, however, ignores the Court's statement that in granting summary judgment to Ohio National the Court "accept[ed] the facts as Paul Morady state[d] them in his brief." R. 275 at 3 (*Ohio Nat'l*, 2014 WL 500539, at *1). Paul Morady already argued in his opposition to Ohio National's motion for summary judgment that he thought that his "program" to finance life insurance was legal based on the fact that he "obtained a legal opinion from a reputable Illinois law firm prior to doing so." R. 263 at 17. Although Paul Morady did not submit a

---

Nov. 15, 2013), in which the court held that "flawed notice" did not prejudice the non-movant who "submitted a variety of documents to oppose summary judgment." *Id.* at 532. But in *Morris* it was undisputed that the movant supplied the pro se non-movant with notice—albeit "flawed" notice—and the question was whether that flawed notice was sufficient. The court held that the non-movant's filings were evidence that the non-movant had been sufficiently notified of how to properly oppose a summary judgment motion. Here, it is undisputed that the Moradys received no notice at all, so the extent or adequacy of Paul Morady's filings in opposition to summary judgment is not relevant to whether the Moradys suffered prejudice.

copy of this opinion with his papers on summary judgment, the Court considered and rejected Paul Morady's defense that he thought his actions were legal and that his intention was to "allow middle class African Americans [sic] to be able to use life insurance as an asset." R. 263 at 17. As the Court held in granting summary judgment to Ohio National, "regardless of any purported altruistic motivations, procuring or encouraging people to buy life insurance 'to use it as an asset' is illegal in Illinois when the person doing the procuring plans to buy the policy," as the evidence undisputedly shows Paul Morady intended to do. R. 275 at 21 (*Ohio Nat'l*, 2014 WL 500539, at *9). The Moradys cannot establish prejudice by pointing to facts and arguments that the Court already considered in the light most favorable to Paul Morady.

Moreover, to the extent the Moradys seek to have the Court reconsider its holding regarding Paul Morady's intent (a motion which would be barred by the 28-day deadline for reconsideration imposed by Federal Rule of Civil Procedure 59(e)), that motion is denied. The Moradys' argument that the legal opinion Paul Morady obtained shows that he did not have the requisite intent to be liable for civil conspiracy conflates two distinct objects of Paul Morady's intent. It may be that Paul Morady did not intend to break the law, but that is generally irrelevant to determining whether he intended to commit actions sufficient to make him liable for civil conspiracy. *See Jones v. Bd. of Educ. of City of Chi.*, 996 N.E.2d 1093, 1099 (Ill. App. Ct. 1st Dist. 2013) ("[I]t has long been the law that everyone is presumed to know the law and ignorance of the law excuses no one."); *see also Jerman v.*

*Carlisle, McNellie, Rini, Kramer & Ulrich, LPA*, 559 U.S. 573, 582-83 (2010) ("Our law is . . . no stranger to the possibility that an act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law."). It is true that a "defendant who *innocently* performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). But Paul Mo"rady does not dispute the Court's findings that he intended to commit the acts that the Court found constituted a civil conspiracy. *See* R. 275 at 20-22 (*Ohio Nat'l*, 2014 WL 500539, at *8-9 (citing *McClure*, 720 N.E.2d at 258 (A "defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives . . . is liable as a conspirator."). Since Paul Morady intentionally committed acts that constitute a civil conspiracy, the Moradys' allegation that Paul Morady did not intend to break the law is of no moment.

## B.  Mavash Morady's Conduct

Additionally, the Moradys argue that Mavash Morady was prejudiced by Ohio National's failure to provide her with the Local Rule 56.2 notice because Mavash Morady did not have the opportunity to "advise[] [the Court] that Ohio [National] permitted Mavash Morady to delegate the application process to [one of her] employee[s] who was accredited by Ohio [National]," and that the Ohio National guidelines Mavash Morady admitted to violating "were issued before [she] became an agent." R. 294 at 4. Even if the Moradys are correct that Mavash Morady

was permitted to "delegate the application process," this does not change the fact that Mavash Morady admitted that she knew that the insurance policies at issue were premium financed, *see* R. 242-1 at 38:21-23, 41:22-24, 56:16-23, in violation of Ohio National's policy. *See* R. 242-12 at 2-3. By submitting the insurance policy applications to Ohio National, Mavash Morady falsely stated that the applications were in compliance with Ohio National's requirements. Mavash Morady knew these statements were false and she made these false statements in order to induce Ohio National to issue the insurance policies. These policies were then purchased and sold by Paul Morady through his company Camden Investment Holdings, for which Mavash Morady served as a director. Mavash Morady's new allegation that Ohio National permitted her to delegate work to her employees does not alter any of these undisputed facts about Mavash Morady's false representation that the insurance policies were not premium financed, and would not have altered the Court's ultimate grant of summary judgment in Ohio National's favor. Thus, Mavash Morady suffered no prejudice from Ohio National's failure to provide her the notice required by Local Rule 56.2.

Therefore, the Moradys' motion to vacate the Court's grant of summary judgment in Ohio National's favor is denied.

## II.  Motion for Judgment on Damages

### A.  Actual Damages

Ohio National seeks $120,271.41 in commissions it paid to Mavash Morady as damages for her breach of contract and fraud, and as damages for Davis and the

Moradys' conspiracy to procure life insurance policies without an insurable interest. As part of this conspiracy, Mavash Morady breached her agency contract with Ohio National and committed fraud by submitting applications for the insurance policies at issue in this case knowing that the applications contained false information. The evidence shows that Ohio National would not have paid Mavash Morady the commissions for the insurance policies she procured along with Davis and Paul Morady if Ohio National knew that Mavash Morady lied about how the policies were procured, because Ohio National's business practices prohibit issuing stranger-originated and premium-financed policies. *See* R. 242-12 at 2. Since Ohio National would not have paid the commissions but for Mavash Morady's breach of contract and fraud, Ohio National's payment of the commissions was the "direct and natural consequence" of (1) Ohio National "acting on the faith of" Mavash Morady's fraudulent representations and (2) Mavash Morady's breach of her agency contract with Ohio National. *See Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 273-74 (7th Cir. 1996) (stating the definition of compensatory damages for fraud under Illinois law); *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 878 (6th Cir. 2007) (stating the definition of compensatory damages for breach of contract under Ohio law).[3] And because Mavash Morady's actions were in furtherance of her conspiracy with Davis and Paul Morady, Ohio National's payment of the commissions was also a direct and natural consequence of the actions of Davis and Paul Morady as members of the conspiracy with Mavash Morady. Thus, Ohio National suffered actual damages in

---

[3] Illinois law governs the fraud claim and Ohio law governs the breach of contract claim.

the amount of the commissions it paid Mavash Morady, and Davis and the Moradys are jointly and severally liable to Ohio National in the amount of $120,271.41.

**B.     Set-Off**

Davis and the Moradys also argue that "Ohio National [must] deduct the profit it made on the policies from its commission expense," and that because the premiums Ohio National retained are greater than the commissions it paid, "Ohio National has no actual damages." R. 295 at 7. Davis and the Moradys cite no authority for this theory of damages. Nevertheless, it is true that in Illinois "'[a]n injured person is entitled to one full compensation for his injuries, and a double recovery for the same injury is against public policy.'" *Ill. Sch. Dist. Agency v. Pacific Ins. Co. Ltd.*, 571 F.3d 611, 615 (7th Cir. 2009) (quoting *Eberle v. Brenner*, 505 N.E.2d 691, 693 (Ill. 1987)). Additionally, "[t]o prevent double recovery by plaintiffs, defendants are entitled to a reduction in damages—sometimes called a 'setoff'—to offset any amounts that the plaintiff already has collected from other sources in compensation for the same injury." *Ill. Sch. Dist. Agency*, 571 F.3d at 615-16 (citing *Eberle*, 505 N.E.2d at 693).

Davis and the Moradys perceive there to be only one bad act in this case—Davis and the Moradys' conspiracy to induce Ohio National to issue the stranger-originated and premium-financed policies—by which Ohio National was damaged in the amount of the commissions, and from which Ohio National gained in the amount of retained premiums. Their characterization of the case, however, fails to accurately identify the injuries and damages. Contrary to Davis and the Moradys'

argument, the fact that Ohio National paid commissions for an insurance policy that was void *ab initio* is an injury *itself*, and the damage resulting from that injury is the monetary amount of the commissions. In addition to the injury of paying the commissions, Ohio National was also injured by having incurred risk of paying death benefits (although none were ever paid out). In compensation for that injury, Ohio National has retained some of the premiums paid on the policies. There is no off-set here because the amount of the commissions and the retained premiums serve as compensation for two distinct injuries—i.e., payment of the commissions, and assumption of the policies' risks, respectively. Thus, Ohio National is entitled to both keep the premiums and recover the commissions.

## C.    Attorney's Fees and Costs

In addition to the commissions it paid Mavash Morady, Ohio National seeks damages in the form of attorney's fees and costs in the amount of $605,395.15. Ohio National acknowledges that, absent a statute to the contrary, a prevailing party must bear its own attorney's fees and costs. Ohio National argues, however, that this case falls within an exception to the general rule which provides that a plaintiff may collect attorney's fees and costs from a defendant "'where the wrongful acts of a defendant involve the plaintiff in litigation with third parties or place him in such relation with others as to make it necessary to incur expenses to protect his interest.'" *Fednav Int'l Ltd. v. Continental Ins. Co.*, 624 F.3d 834, 840 (7th Cir. 2010) (quoting *Ritter v. Ritter*, 46 N.E.2d 41, 44 (Ill. 1943)). Ohio National contends that this exception is applicable here because the conspiracy among the Moradys and

Davis to procure insurance policies without an insurable interest (and Mavash Morady's fraud and breach of contract in furtherance of that conspiracy) forced Ohio National to sue Egbert and the other policy holders to "protect [its] interest," *Ritter*, 46 N.E.2d at 44, by seeking to void the policies to ensure that Ohio National would not be required to pay the total of $2.8 million in death benefits provided for by the policies. *See* R. 278 at 6. Ohio National reasons because the Moradys and Davis "'involved'" Ohio National in litigation with Egbert and the other owners of the insurance policies, "'the expenses incurred in that litigation are . . . damages no less compensable than any other element of damage resulting from the tort'" committed by Davis and the Moradys. R. 278 at 5 (quoting *Champion Parts, Inc. v. Oppenheimer & Co.*, 878 F.2d 1003, 1006 (7th Cir. 1989)); *see also Fednav*, 624 F.3d at 840 (The Seventh Circuit has "noted that the 'theory behind this exception is that a tortfeasor should be held responsible for all of the natural and proximate consequences of his actions.'" (quoting *Champion Parts*, 878 F.2d at 1006)).

Davis and the Moradys do not dispute the accuracy of the $605,395.15 amount of attorney's fees and costs, or that it is reasonable. Instead, Davis and the Moradys contend that "[n]o fees are sought for third party litigation," so the exception to the general rule is not applicable. R. 295 at 3. But, as Ohio National points out, this is an incorrect description of the case, since in addition to Davis and the Moradys, Ohio National also sued Egbert and the other policy holders to obtain a declaratory judgment that the policies were void *ab initio*. Indeed, Ohio National's greatest monetary interest in this case was to ensure that Ohio National would not

have to pay out the $2.8 million in total death benefits due under the policies, which could only be accomplished by suing Egbert and the other policy holders. All of the fees and costs Ohio National seeks were incurred in obtaining the declaration on summary judgment and settlements during the course of the litigation with the policy holders other than Egbert. Notably, Ohio National does not seek fees or costs for any litigation expenses incurred after the Court issued the declaratory judgment, meaning that all the fees and costs Ohio National seeks were expended in pursuit of the declaratory judgment.

Further, the fact that Ohio National sued Egbert and the other the policy holders in the same action as Davis and the Moradys does not mean that Ohio National cannot recover fees and costs attributable to its litigation with Egbert and the other policy holders. Illinois appellate courts have affirmed fee awards in very similar circumstances. For instance, in *Duignan v. Lincoln Towers Insurance Agency, Inc.*, 667 N.E.2d 608 (Ill. App. Ct. 1st Dist. 1996), the plaintiff sued in the same action both the insurance broker from whom the plaintiff purchased car insurance, and the insurance company that issued the policy the plaintiff purchased. The broker contacted the insurance company to cancel the policy without authority from the plaintiff, and the insurance company refused to cover subsequent damage to the plaintiff's car. The court awarded the plaintiff the attorney's fees the plaintiff incurred in suing the insurance company as damages to be paid by the broker because fees and costs were an "expense . . . directly attributable to [the broker's] actions." *Id.* at 613. The court explained, however, that

once the insurance company settled and the broker was the sole remaining defendant, the plaintiff could no longer collect fees and costs incurred for the litigation beyond that point. *Id.*

Similarly, in *National Wrecking Co. v. Coleman*, 487 N.E.2d 1164 (Ill. App. Ct. 1st Dist. 1985), the court held that the plaintiff could state a claim for attorney's fees and costs against one of the two defendants the plaintiff sued in the same action. The plaintiff sued both a former client for breach of contract and an advisor to the client for interference with contract. The court held that the attorney's fees the plaintiff incurred in suing its former client for breach of contract were the "natural consequence" of the client's advisor's alleged interference with the contract. The court reasoned that the plaintiff could seek an award of fees as damages against the client's advisor because "[i]t is implicit that [the advisor's] alleged interference with [the plaintiff's] contract with [its client] would probably result in an ensuing action by [the plaintiff] against [its client] for the breach of that contract." *Id.* at 1167.

The *Duignan* and *National Wrecking* decisions show that under Illinois law "[i]t is irrelevant whether [plaintiffs] request[] their attorney fees in a separate tort action." *Goldstein v. DABS Asset Manager, Inc.*, 886 N.E.2d 1117, 1121 (Ill. App. Ct. 1st Dist. 2008). What is relevant is whether the attorney's fees at issue were incurred in order to litigate against the defendant as opposed to a third party. *See id.* (counterclaim for attorney's fees where defendant argued that the primary claim constituted a breach of fiduciary duty was impermissible regardless of whether the

counterclaim is considered a "separate action"). Thus, a plaintiff's decision to go on the "offensive[]" against two defendants at the same time does not destroy the plaintiff's opportunity to collect attorney's fees as damages from the defendant who caused the plaintiff to litigate against the other defendant, because "it [is] not for the defendant to dictate what course the plaintiff should take to remedy the evil which had been wrongfully brought upon him, so [long] as the remedy adopted was . . . [a] legal one." *National Wrecking*, 487 N.E.2d at 1167.

Additionally, whether the attorney's fees and costs Ohio National seeks as damages are reasonable is a decision within the Court's discretion. Davis and the Moradys, however, have not challenged the reasonableness of the amount of fees and costs Ohio National seeks. It is not the Court's responsibility to make a party's argument for it. *See Costello v. Grundon*, 651 F.3d 614, 639 n.7 (7th Cir. 2011) (quoting *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.")). Thus, the Court will not reject Ohio National's claim for fees and costs as unreasonable.[4]

Therefore, the Court grants Ohio National's motion for damages in the amount of $605,395.15 in attorney's fees and costs.

---

[4] Davis and the Moradys also oppose an award of fees and costs as premature under Federal Rule of Civil Procedure 54 and 28 U.S.C. § 1920. Both of these provisions, however, pertain to prevailing party fees and costs, whereas here—as the Court has discussed—Ohio National seeks fees and costs as an element of damages. Moreover, the Court directed Ohio National to file this motion at this time and in this form. *See* R. 300 at 6-7, 9-10, 14. Thus, Ohio National's motion is not premature.

### D.    Punitive Damages

Ohio National also seeks punitive damages from Davis and the Moradys. The Illinois Supreme Court has held that punitive damages "are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Slovinski v. Elliot*, 927 N.E.2d 1221, 1225 (Ill. 2010). Because the purpose of a punitive damages award is to "punish and deter," they may only be awarded for "conduct involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others." *Loitz v. Remington Arms Co., Inc.*, 563 N.E.2d 397, 415-16, 427 (Ill. 1990). "To determine whether punitive damages are appropriate, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant." *Slovinski*, 927 N.E.2d at 1225. Further, punitive damages "may be awarded when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate wanton disregard of the rights of others." *Id*. Yet, "deceit alone cannot support a punitive damage award." *Home Sav. and Loan Ass'n of Joliet v. Schneider*, 483 N.E.2d 1225, 1228 (Ill. 1985). "Illinois courts . . . insist that plaintiffs must establish not only simple fraud but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice

or willfulness." *Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1276 (7th Cir. 1993). Such "malice or willfulness" is generally demonstrated by an "inten[t] to financially damage" the plaintiff. *See Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 276 (7th Cir. 1996).

In seeking punitive damages, Ohio National emphasizes that "Illinois law abhors the illegal practice of wagering on human life," and that stranger-originated life insurance policies "are illegal because they are morally repugnant and dangerous to insureds." R. 278 at 12. Ohio National also notes that Davis and the Moradys "deliberately targeted African American [sic] senior citizens . . . specifically because [they] believed [that demographic has] shorter life expectancies." *Id.* Ohio National's argument, however, both paints a false picture of the harm Davis and the Moradys' conduct actually caused in general, and improperly attempts to focus the Court's attention on the insureds in particular, who are not plaintiffs in this case. Although procuring life insurance without an insurable interest is illegal because it raises the specter of a person having an "'interest in having [another's] life come to an end,'" *Bajwa v. Met. Life Ins. Co.*, 776 N.E.2d 609, 617 (Ill. App. Ct. 1st Dist. 2002) (quoting *Grigsby v. Russell*, 222 U.S. 149, 154-55 (1911)), there is no contention here that Davis or the Moradys were plotting anything so nefarious. In fact, the evidence shows that Davis and the Moradys hoped to relieve themselves of any connection with the policies they procured, and the insureds themselves, as soon as possible by selling the policies for profit. As much as Ohio National would like to paint Davis and the Moradys as the vilest of predators because they

supposedly "have a sinister financial stake in the insureds' early death," that is an inaccurate description of the bad acts for which Davis and the Moradys are liable. Despite Davis and the Moradys' admission that they "targeted" African-American senior citizens, there is no evidence in the record that Davis and the Moradys intended to harm the insureds. In fact, the evidence indicates that some of the insureds made money from their transactions with Davis and the Moradys. *See* R. 242-14 at 7 (19:12–20:10) (Bonaparte—one of the original senior citizens "targeted" by Davis and the Moradys—testified that he received an amount somewhere between $4,000 and $6,000 for applying for the life insurance policy).

Since there is no evidence that Davis and the Moradys harmed, or intended to harm, the insureds, and the insureds are not plaintiffs in this case, the purpose behind protecting potential insureds from stranger-originated life insurance policies is not present here. And since that threat is not present, it will not be a factor in the Court's analysis of whether punitive damages are warranted. Rather, the Court focuses on the harm Davis and the Moradys' caused Ohio National to determine whether punishment or deterrence is warranted. Davis and the Moradys are liable for conspiring to induce Ohio National to issue life insurance policies Ohio National would not have otherwise issued, in a manner contrary to public policy. Ohio National was not harmed because Davis and the Moradys participated in the secondary life insurance market—which is not illegal—but by their conspiracy to

deceive Ohio National.[5] It is this conspiracy, and not the public policy fears justifying the prohibition on stranger-originated life insurance policies, that is the appropriate target of any punishment and deterrence in this case.

Having stripped away Ohio National's argument that "a sinister financial stake in the insureds' early death" is the appropriate focus of the Court's attention, it becomes clear that Davis and the Moradys' conspiracy to deceive Ohio National is not so outrageous that punitive damages are warranted. The actions by Davis and the Moradys are certainly objectionable and illegal, but they do not evince an "inten[t] to financially damage" Ohio National. Ohio National does not allege that the conspiracy caused it actual damages beyond the commissions it paid Mavish Morady. Further, Ohio National does not allege that the life insurance policies it was induced to issue were any riskier than the policies Ohio National issues in the regular course of its business. Hypothetically, Davis and the Moradys could have lied about factors directly relevant to Ohio National's risk of loss on the policies, such as the insureds' health or age. This would have increased Ohio National's risk of loss and been evidence that Davis and the Moradys intended to harm Ohio National in particular. Instead, Davis and the Moradys failed to inform Ohio

---

[5] The Court is of course aware that neither Davis nor Paul Morady has been found liable for fraud. Nonetheless, they are both liable for conspiracy to procure life insurance policies without an insurable interest, and Mavash Morady's fraud and breach of contract were committed in furtherance of the conspiracy to which Davis and Paul Morady were parties. Thus, the element of deception Mavash Morady added to the conspiracy is also attributable to Davis and Paul Morady to the extent that the Court must "consider the character of the defendant[s'] act[s], [and] the nature and extent of the harm to the plaintiff that the defendant[s] caused or intended to cause," in determining whether punitive damages are warranted for their conduct. *See Slovinski*, 927 N.E.2d at 1225.

National that they had procured the policies without an insurable interest and that the policies were premium financed. There is no evidence in the record, however, that these factors increased Ohio National's risk, and that Davis and the Moradys' conspiracy to misinform Ohio National about these factors caused an injury to Ohio National beyond the commissions it paid Mavash Morady. The evidence *does* show that Ohio National will not issue policies with such characteristics—most likely because they increase the chance that the policies will lapse for failure to pay premiums, and that Ohio National might become involved in litigation like this case. But Ohio National will be compensated for the commissions on the policies and the expenses of this litigation. Without evidence in the record that Davis and the Moradys falsified health or other information relevant to the insureds' life expectancies, thereby increasing Ohio National's risk of paying death benefits before the paid premiums had created a profit for Ohio National on the policies, the Court cannot say that Ohio National was subject to any greater risk than it already assumes in the regular course of its business.

Without such increased risk to Ohio National, the Court cannot find that Davis and the Moradys "intended to financially damage" Ohio National, and punitive damages are not warranted absent such intent. *See Roboserve*, 78 F.3d at 276 ("What the record lacks is some indication that [the defendants] intended to financially damage [the plaintiff]. Without such evidence, the malice, wantonness or grossness that under Illinois law must characterize conduct justifying the imposition of punitive damages is absent."). The actions of Davis and the Moradys

are nothing more than "garden variety" deceit in the business context that courts have found does not warrant punitive damages. *Id.* ("Rather than evidence of outrageous conduct, what emerges from a review of the facts is a picture of a highly competitive marketplace with sophisticated advocates on all sides jockeying for position and profit. [The defendant] indeed played loose with its contractual obligations and was less than candid—and may even have lied—about its present actions and future plans."); *see also Boyd v. Tornier, Inc.*, 656 F.3d 487, 497 (7th Cir. 2011) ("[The defendant] engaged in a fraudulent business strategy with sophisticated business partners. It may have realized that [the plaintiffs] could be affected financially by its misrepresentations, but it was acting in the business arena with parties that were capable of protecting themselves. This falls short of reckless indifference. Moreover, though tortious and objectionable, [the defendant's] conduct was not outrageous. Bad consequences resulted for [the plaintiffs], and they will be compensated for their losses."); *Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266 (7th Cir. 1993) (manufacturing company liable to its parts supplier for breach of contract and tortious interference was not liable for punitive damages where manufacturing company decided not to buy the parts supplier, and instead breached the parts contract and purchased another parts supplier company). Generally, when courts award punitive damages for deceitful or fraudulent conduct, the circumstances are akin to a "con-man" stealing from unsuspecting individuals. The personal interactions and the actual monetary loss they cause are what make the conduct outrageous and deserving of punitive damages. *See Kapelanski v.*

*Johnson*, 390 F.3d 525, 531 (7th Cir. 2004) (phony investment scheme perpetrated on individual investors); *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 512 (7th Cir. 1997) (corporate representatives "made a series of utterly false representations in order to induce [an individual landlord] to execute [a] lease"); *West v. Western Cas. and Sur. Co.*, 846 F.2d 387, 392 (7th Cir. 1988) (employer lied to employee about options for protecting legal rights after workplace accident); *Future Envtl., Inc. v. Forbes*, 2014 WL 3026485, at *2 (N.D. Ill. July 3, 2014) (truck driver fraudulently used fuel credit card provided by his employer to sell fuel to third parties for profit); *Levy v. Markal Sales Corp.*, 643 N.E.2d 1206, 1214 (Ill. App. Ct. 1st Dist. 1994) (two of three individuals who were the sole shareholders of a company conspired to use the assets of the company to form and run a new company without the third partner's knowledge). Here, by contrast, Davis and the Moradys conspired to deceive Ohio National, but Ohio National is a sophisticated business entity that was induced into arms-length business agreements. The deceit is illegal, and Ohio National has recovered for its injuries. However, this sort of bad business dealing is not so outrageous that punitive damages are warranted.

## Conclusion

For the foregoing reasons, (1) the Moradys' motion to vacate the Court's grant of summary judgment in Ohio National's favor, R. 289, is denied, and (2) Ohio National's motion for judgment on damages, R. 277, is granted to the extent that judgment is entered in favor of Ohio National and against Davis and the Moradys, jointly and severally, in the amount of $725,666.56 (comprised of $120,271.41 in

damages in the form of commissions paid to Mavash Morady, plus $605,395.15 in damages in the form of attorney's fees and costs expended in seeking the declaratory judgment), and denied to the extent that the Court will not grant Ohio National punitive damages.

Additionally, judgment is entered in favor of Egbert and against Ohio National in the amount of $90,644.38. The Clerk of the Court is directed to release the funds in escrow in this case in the amount of $90,644.38 to Steven Egbert, to satisfy the judgment against Ohio National. The Clerk of the Court is also directed to release the remainder of the funds in escrow in this case, plus the accrued interest, and minus the registry fee, to Ohio National. Ohio National should submit an Internal Revenue Service Form W-9 to the Clerk of the Court to secure the release of the funds.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: October 24, 2014